UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHRISTOPHER BROWN,

      *Petitioner*,

      v.

COMMISSIONER, DEPARTMENT
OF CORRECTION,

      *Respondent*.

No. 3:21-cv-0752 (MPS)

**RULING ON PETITION FOR WRIT OF HABEAS CORPUS**

      Petitioner Christopher Brown, an inmate incarcerated at Cheshire Correctional Institution in Cheshire, Connecticut, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. On January 24, 2014, a jury of the Connecticut Superior Court found Brown guilty of kidnapping in the second degree in violation of Conn. Gen. Stat. § 53a–94 (a), and conspiracy to commit kidnapping in the second degree in violation of Conn. Gen. Stat. §§ 53a–48 (a) and 53a–94 (a). The trial judge sentenced Brown to a total effective term of forty years incarceration, execution suspended after twenty-three years, followed by five years conditional discharge.  Brown sought post-conviction relief, including a new trial pursuant to Conn. Gen. Stat. § 52-270.  In his motion for new trial, Brown argued that a new trial was necessary due to (1) the discovery of new impeachment evidence concerning Karina Reed-O'Meally,[1] who did not testify at Brown's trial but assisted the police officers in their investigation of the kidnapping and testified at Brown's co-defendant's trial, and (2) the State's failure to disclose the new impeachment evidence, in

---

[1] Reed-O'Meally's name is spelled differently throughout the various state court opinions, i.e., "Reed," "Reid-O'Meally," or "Kerina."  For consistency, the Court will refer to her as "Reed-O'Meally," or "Reed."

violation of *Brady v. Maryland*, 378 U.S. 83 (1963). The trial court denied Brown's motion for

new trial. Brown appealed the trial court's decision on the ground of newly discovered evidence

but did not challenge the trial court's decision on the *Brady* issue. The Connecticut Appellate

Court affirmed the trial court's denial of the motion for new trial, and the Connecticut Supreme

Court denied review of the Connecticut Appellate Court's decision. Now, Brown, who is

representing himself, challenges his conviction and sentence under Section 2254, arguing that the

trial court improperly denied his motion for new trial and that the new impeachment evidence

regarding Reed-O'Mealy necessitates a new trial. *See* ECF No. 1 at 22–32; ECF No. 18 at 2.

Brown does not raise the *Brady* issue in his Section 2254 petition. On October 22, 2021, the

Commissioner of the Department of Correction ("Commissioner") filed a motion to dismiss

Brown's Section 2254 petition. ECF No. 10. For the reasons below, the Court grants the

Commissioner's motion to dismiss.

I.     **BACKGROUND**

A. **Conviction and Sentencing**

Based on the evidence presented at Brown's jury trial, the Connecticut Appellate Court

found that the jury reasonably could have found the following facts. *State v. Brown*, 161 Conn.

App. 483, 485 (2015).

> In the early morning of August 4, 2012, the defendant, Christopher Anthony
> Brown, and two associates abducted the victim, Neville Bar, and brought him to an
> abandoned building located at 27 Glendale Avenue in Hartford. The defendant and
> his two associates brought the victim to the basement of 27 Glendale Avenue, tied
> his wrists and ankles with rope, and threatened him at gunpoint, demanding to know
> where he kept his supply of marijuana and cash. During the incident, the defendant
> and his associates stabbed the victim in the leg, hit him in the face with a gun several
> times, and tortured him by melting a plastic water bottle onto his arms. Before
> leaving the abandoned basement, the three men took the victim's wallet, which
> contained $700, tied him with a blanket and a string of Christmas lights, and left
> him in a bathtub.

On the morning of August 5, 2012, Hartford police officers found the victim in the basement of 27 Glendale Avenue after a neighbor heard him screaming for help. When discovered, the victim was standing in the bathtub, covered in feces and urine, and bound by rope, the string of Christmas lights, and the blanket. He was confused and could only provide disjointed answers to police questioning about the incident and the identity of his assailants. He was then sent to Hartford Hospital for treatment of his wounds and dehydration.

Later that day, Hartford police Detective Richard Salkeld visited the victim at the hospital at which time the victim informed Salkeld that the three assailants were black Jamaican men, one of whom had a "milky-white" left eye.

Following his conversation with the victim, Salkeld spoke to the victim's wife, Margaret Bar, and his niece, Karina Reed. Reed informed Salkeld that she knew a Jamaican male who had recently been evicted from 27 Glendale Avenue, but still used that location as a place to party. She identified the Jamaican male as "Banit" and described him as having only "one eye."

On the basis of the descriptions provided by the victim and Reed, Salkeld searched the Hartford Police database for black Jamaican men associated with 27 Glendale Avenue. That search revealed that the defendant had recently been a resident of 27 Glendale Avenue. A physical description of the defendant in the police booking system indicated that one of the defendant's eyes was "whited over."

In the morning of August 6, 2012, Hartford police Detective Renee LeMark–Muir received information from a registered confidential informant who, in the past, had provided the police with credible and reliable information that had led to the identification and location of suspects. The confidential informant told LeMark–Muir that on August 5, 2012, Reed had contacted the informant, asked whether the informant had information regarding the abduction of the victim, and asked whether a Jamaican male known as "Banit" had been involved. The informant told the detective that the informant had then spoken to the defendant, whom the informant knew by his street name "Banit." The informant stated that the defendant had confessed to kidnapping, tying up, beating, and melting a plastic bottle on the victim. The informant also stated that the defendant did not believe that the victim would identify him or his two associates because the victim was afraid of them.

On the basis of the results of the police database search, the descriptions of the assailants from the victim and Reed, and the information from the confidential informant, Hartford police Detective David Ritcher prepared a photographic array consisting of eight photographs, one photograph of the defendant and seven of black men of similar age, appearance, and dress. To further make uniform the appearance of the individuals and eliminate the distinct characteristic of the defendant's eye, Ritcher blacked out the left eye of each individual in the photographic array.

At approximately noon, on August 6, 2012, Ritcher and Salkeld visited the victim in the hospital. They administered the standard witness identification instructions and also gave the victim a form containing the same instructions. The victim initialed each instruction and signed the form, indicating that he understood each instruction. The detectives then presented the photographic array to the victim, who selected the photograph of the defendant, whom he knew as "Banit." He then provided the police with a signed voluntary statement stating "this is the guy who robbed me and kidnapped me."

The defendant was subsequently arrested pursuant to a warrant and charged in a five count long form information with: kidnapping in the second degree in violation of § 53a–94 (a); assault in the second degree in violation of General Statutes § 53a–60 (a)(2); robbery in the first degree in violation of General Statutes § 53a–134 (a)(4); conspiracy to commit kidnapping in the second degree in violation of §§ 53a–48 (a) and 53a–94 (a); and conspiracy to commit assault in the second degree in violation of §§ 53a–48 (a) and 53a–60 (a)(2).

*Id.* at 485–87.

On January 24, 2014, the jury found Brown guilty of "kidnapping in the second degree in violation of § 53a–94 (a), and conspiracy to commit kidnapping in the second degree in violation of §§ 53a–48 (a) and 53a–94 (a)." *Id.* at 491; *Brown v. State*, No. HHDCV166073284, 2018 WL 5046176, at *9 (Conn. Super. Ct. July 20, 2018). On April 16, 2014, the trial judge sentenced Brown to "to a total effective term of forty years incarceration, execution suspended after twenty-three years, followed by five years conditional discharge." *Brown*, 161 Conn. App. at 491; *Brown*, 2018 WL 5046176, at *1.

### B. Motion for New Trial in State Court[2]

---

[2] In addition to his motion for new trial, Brown also appealed his conviction and filed a petition for writ of habeas corpus in state court. None of the issues raised in his appeal or his state habeas petition are raised here in Brown's Section 2254 petition.

In his appeal, Brown argued "that the trial court abused its discretion by denying his motion for disclosure of the identity of the confidential informant" in a pretrial proceeding. *Brown*, 161 Conn. App. at 491. On November 24, 2015, the Connecticut Appellate Court affirmed Brown's conviction and found that the "trial court did not abuse its discretion" by denying Brown's motion for disclosure. *Id.* at 497. In his state habeas petition, Brown raised three issues: (1) ineffective assistance of trial counsel during trial, (2) ineffective assistance of trial counsel in his petition for a new trial, and (3) violation of Brown's right to due process arising from the alleged ineffective assistance by trial counsel. *Brown v. Warden*, No. CV15-4006898-S, 2022 WL 2697537, at *1 (Conn. Super. Ct. July 11, 2022). On July 11, 2022, the trial court dismissed Brown's claims either for failure to a state a claim for which habeas relief can be granted or for procedural default. *Id.* at *15.

4

On November 16, 2016, Brown filed a motion for a new trial pursuant to Conn. Gen. Stat. § 52-270, arguing that he was entitled to a new trial based on (1) the newly discovered evidence that Bar's niece, Karina Reed-O'Meally, "was aware that assisting the police in a criminal matter would render her eligible for relief in a pending deportation case," and (2) the State's "failure to disclose as exculpatory evidence that Ms. Reed-O'Meally had previously requested a letter from law enforcement authorities confirming her assistance in order to obtain deportation relief." *Brown*, 2018 WL 5046176, at *1, *13; *see also* Conn. Gen. Stat. § 52-270 ("The Superior Court may grant a new trial of any action that may come before it, for…the discovery of new evidence …."). Reed-O'Meally did not testify at Brown's trial, but she did testify at the trial of Brown's co-defendant, Damian Williams, who was also known as "Angel," on June 2, 2015 and June 5, 2015. *Brown*, 2018 WL 5046176, at *9; *Brown v. Warden*, No. CV15-4006898-S, 2022 WL 2697537, at *8–9 (Conn. Super. Ct. July 11, 2022). Reed-O'Meally's testimony at the Williams's trial served as the basis for the newly discovered evidence claim in the motion for new trial. *Brown*, 2018 WL 5046176, at *9. Williams was acquitted. *Id.*

     i.     <u>Reed-O'Meally's Testimony at the Trial of Brown's Co-Defendant</u>

On June 2, 2015, Reed-O'Meally testified at Williams's trial that when the police informed her that Bar had been kidnapped, "she told the police she[] knew people associated with [27 Glendale Avenue] and gave the police nicknames [of those associated with that address]. One of the persons associated with the house was 'Bama,' and the other, for whom she did not have a nickname, was a 'one-eyed' individual. She later told the police, based on what she heard on the street, that the three people responsible for what happened to her uncle were the one-eyed individual, another called 'Angel,' and a person known as 'Bama.'" *Id.* at *9. She

further testified that she was not a U.S. citizen and that she was facing deportation in a pending

immigration case.  *Id.*  She stated that "she had not been told by the prosecutor's office that, if

contacted by immigration authorities, the office would" inform them that she was testifying in

Angel's case.  *Id.*  She agreed that if a prosecutor or law enforcement signed off on her U-Visa

application, she would avoid deportation.  *Id.*  A U-Visa grants immigration relief to a "victim to

a crime or a derivative of a victim to a crime."  *Id.* at *11.  She testified that she sought a letter

"[y]ears ago" from the prosecutor regarding her immigration status.  *Id.* at *9.

       When Reed-O'Meally testified again on June 5, 2015, defense counsel read into the

record a stipulation, which stated that "on June 2, 2015, Robin Krawczyk[, the prosecutor,] told

[Karina Reed-O'Meally] that if [Krawczyk] needed, she would tell [the] Immigration authorities

that [] [Reed-]O'Meally testified in [Angel's] case … in furtherance of her application for relief

from deportation."  *Id.* at *9–10; *Brown*, 2022 WL 2697537, at *2 (identifying Krawczyk as the

"trial prosecutor").  Following the reading of the stipulation, Reed-O'Meally testified as follows:

> Q. Your case is still pending, correct, ma'am?
> A. Yes.
> Q. To be deported, correct?
> A. Yes.
> Q. That means going back to Jamaica forever, correct?
> A. No.
> Q. For how long?
> A. For five years.
> Q. You certainly do want to stay here, correct?
> A. If I have to.
> Q. You're fighting it in court, aren't you?
> A. Isn't this what everybody do?
> Q. Are you fighting it in immigration court, yes or no?
> A. I'm letting the court deal with it. I'm not fighting nothing.
> Q. You know that if the prosecutor wrote a letter for you, you'd be eligible
> for relief of deportation if immigration found that you assisted in a
> prosecution, is that correct?
> A. Yes.
> Q. So certainly your testimony here would clinch that for you, wouldn't it?

A. I don't need that offer anymore so it doesn't have nothing to do with my immigration.

*Brown*, 2018 WL 5046176, at *10.

ii.   <u>Trial Court's Hearing on the Motion for New Trial</u>

The trial court held an evidentiary hearing on the motion for new trial at which Brown presented three witnesses: Reed-O'Meally and her immigration attorneys, Attorney Gregory Osakwe and Attorney Tanya Dorman.  *Id.*  The State presented Detective Salkeld as a witness and submitted as evidence reports on the investigation of the kidnapping from Detective Salkeld, and Detective LeMark-Muir.  *Id.* at *12.

Attorney Osakwe represented Reed-O'Meally in her immigration case starting in 2008. *Id.* at *11.  When Attorney Osakwe learned that Reed-O'Meally "may have been a victim of, or a witness to, a crime, … he contacted the State's Attorney's Office to ascertain whether [she] was a victim" to determine her eligibility for a U-Visa.  *Id.*  Attorney Osakwe was unable to recall the details, i.e., who he spoke with and when he called the State's Attorney's Office, but he believed that he spoke to a female prosecutor "either in 2011 or 2012" and that the State's Attorney's Office declined "to certify … [Reed-O'Meally's] U-Visa application."  *Id.*  He further testified that "he probably gave [Reed-O'Meally a] Form I-918," which is an application for a U-Visa. *Id.*  Brown submitted as an exhibit a blank and undated Form I-918 with a handwritten note, stating: "To Miss Robin[.] this is [Karina Reed. I] am leaving the letter for you to fill out and I will pick it up at your convenience[.] any questions you can call Attorney Gregory Osakwe … or me … and again thanks very much."  *Id.*  Attorney Osakwe testified that Reed-O'Meally "apparently delivered [the Form I-918] to the Assistant State's Attorney, but he was not sure." *Id.*

7

On June 15, 2015, Attorney Dorman took over Reed-O'Meally's immigration case. *Id.* Reed-O'Meally told Attorney Dorman that Attorney Osakwe had indicated that Reed-O'Meally might be eligible for a U-Visa. *Id.* Attorney Dorman received Attorney Osakwe's file on Reed-O'Meally, and the file did not contain any indication that Attorney Osakwe had communicated with the State's Attorney's Office. *Id.* Thus, on November 5, 2015, Attorney Dorman sent a letter to the State's Attorney's Office, asking whether the Office was assisting Reed-O'Meally with "any kind of Visa B, U Visa, T Visa, S Visa." *Id.* Attorney Dorman testified that Reed-O'Meally was not a candidate for a U-Visa because she was not a victim of a crime. *Id.*

Detective Salkeld testified that he spoke to Bar at the hospital, who said that the perpetrators had Jamaican accents and one had a "dead eye" that "was milky white." *Id.* Detective Salkeld left the hospital and went to 77 Woodland Street to speak with Bar's wife and Reed-O'Meally. *Id.* Reed-O'Meally told Detective Selkeld that "she had partied at 27 Glendale and would be able to find out nicknames of her uncle's kidnappers." *Id.* Detective Salkeld testified that he "believed [Reed-O'Meally] was going to talk to friends who also partied at the location and would keep in touch as to any further information." *Id.*

Detective Salkeld also testified that the "suspect was developed using the in-house computer system based on information from the victim, niece, and [the confidential] informant." *Id.* According to Detective LeMark-Muir's report, the confidential informant stated that Brown told him that Brown, Rama, and Angel kidnapped Bar. *Id.* at *13. Detective LeMark-Muir's report also noted that the confidential informant was contacted initially by the "victim's niece." *Id.* at *14 n.24. Detective LeMark-Muir conveyed the information from the confidential informant to Detective Salkeld. *Id.* at *13.

Detective Salkeld testified that "[d]uring the investigation of the case, [he] was unaware that [] Reed-O'Meally had any deportation issues or any immigration case pending." *Id.* at *12. In addition, he indicated that Reed-O'Meally never asked him to "certify any document or 'letters'" regarding her immigration status, that "the information she provided was not conditional on [his], or his Department, helping her in any immigration proceedings," and that "Reed-O'Meally was not a registered confidential informant." *Id.*

    iii.   <u>Trial Court's Denial of the Motion for New Trial</u>

On July 20, 2018, the trial court issued an opinion denying the motion for new trial. The trial court's reasoning is summarized below.

Brown argued that the new evidence regarding Reed-O'Meally warranted a new trial. *Id.* at *13. Under Connecticut law, the trial court may grant a new trial based on the discovery of new evidence if the petitioner satisfies the standard set forth in *Asherman v. State*, 202 Conn. 429 (1987). *Id.* To satisfy the *Asherman* standard, "[t]he petitioner must demonstrate, by a preponderance of the evidence, that: (1) the proffered evidence is newly discovered, such that it could not have been discovered earlier by the exercise of due diligence; (2) it would be material on a new trial; (3) it is not merely cumulative; and (4) it is likely to produce a different result in a new trial." *Id.* (quoting *Asherman*, 202 Conn. at 434). With respect to the fourth prong, the standard is "probable acquittal," *id.* at *18, or, in other words, "the new evidence would be likely to result in acquittal of the petitioner, not merely that it might cause one or more jurors to have a reasonable doubt about the petitioner's guilt," *id.* at *16 (internal quotation marks omitted) (quoting *Skakel v. State*, 295 Conn. 447, 468 (2010)).

Applying the *Asherman* standard to Brown's case, the trial court concluded that the newly discovered evidence satisfied every prong except the fourth. Specifically, the trial court

determined that the evidence regarding Reed-O'Meally's immigration status (1) was newly discovered and could not have been discovered earlier by the exercise of due diligence, (2) would be material to a new trial because it was "minimally, but sufficiently, associated with perpetrator identification, the central issue in the case," (3) was not cumulative of the other trial evidence and was new in regards to the issue of Reed-O'Meally's motivation to assist the police, and (4) would not result in acquittal. *Id.* at \*14–18. In reaching its conclusion regarding the fourth prong, the trial court noted that Reed-O'Meally "testified, perfectly credibly, that the information she provided, almost immediately after her uncle had been found and hospitalized, was given without any regard to her immigration status, but was to help her uncle." *Id.* at \*17. The trial court characterized the new evidence as "impeachment material" and stated that even if Reed-O'Meally testified at the new trial and was impeached by the new evidence, "such impeachment would not give rise to a reasonably probable acquittal." *Id.* at \*18. The trial court also reasoned that, without the information from Reed-O'Meally, the police could have relied on the following evidence to support including Brown in the photographic array: the location of the crime (27 Glendale), Bar's description of the perpetrator (a "Jamaican male missing one eye"), and information from the police database, identifying the person associated with 27 Glendale. *Id.* The trial court further reasoned that Bar identified Brown from the photo array as one of the perpetrators of the kidnapping, "regardless of any impeachment of [Reed]-O'Meally." *Id.* Thus, the trial court concluded that "an acquittal on retrial [was] highly improbable" even with the newly discovered evidence and denied the motion for new trial. *Id.*

Brown also argued that the State's failure to disclose the new evidence regarding Reed-O'Meally violated *Brady*. *Id.* at \*19. The trial court found that (1) any information about Reed-O'Meally's immigration status that the State had "inadvertently went undisclosed," (2) the new

evidence was favorable to Brown, and (3) the new evidence "would not have altered the whole case substantially or detracted from the overall inculpatory presentation in any way sufficient to diminish confidence in the integrity of the jury verdict." *Id.* at *19–21.  Thus, the trial court concluded that Brown failed to establish a *Brady* violation.

In his *Brady* claim, Brown also "question[ed] the fairness and reliability of the identification." *Id.* at *22.  Brown argued that if Reed-O'Meally did not contact the confidential informant, then there would be no case against Brown because the detectives would not have received information from that confidential informant.  *Id.*  The trial court disagreed because the information from the confidential informant "was not requisite to the preparation of a proper (non-suggestive) array, and a reliable identification stemming from that array." *Id.*  Thus, the trial court concluded that, based on the record, it was "unable to find anything regarding the role of the informant in this case that gives cause for a lack of confidence in the jury verdict." *Id.*

iv.    Brown's Appeal of the Trial Court's Decision

Brown appealed, arguing that the trial court erred by concluding that the newly discovered evidence would not produce a different result at trial, especially in light of the fact that Reed-O'Meally testified at Williams's trial and Williams was acquitted.  ECF No. 10-2 at 15, 18.  Brown did not challenge the trial court's decision on the *Brady* issue.  *Id.* at 14 n.4.  On November 24, 2020, the Connecticut Appellate Court affirmed the trial court's denial of Brown's motion for new trial.  *Brown v. State*, 201 Conn. App. 903 (2020) (per curiam).  Brown filed a petition for certification to the Connecticut Supreme Court for review of the Connecticut Appellate Court's decision in which, again, he raised a single issue: whether the Connecticut Appellate Court erred in affirming the trial court's decision that the newly discovered evidence, if presented at a new trial, was unlikely to produce a different result for Brown.  ECF No. 10-6 at

2.  On January 5, 2021, the Connecticut Supreme Court denied Brown's petition for certification. *Brown v. State*, 336 Conn. 904 (2021).

## II.     DISCUSSION

On June 1, 2021, Brown filed the present petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Brown states that he "seek[s] relief on the *sole* ground that [he] has newly discovered evidence."  ECF No. 18 at 1 (emphasis added).  Brown argues that he "falls under [the *Asherman*] legal standard" for a new trial and "contests the determination of the [state] courts that his new evidence will [not] produce a different result at a new trial."  ECF No. 18 at 1.  He further argues that the newly discovered evidence shows that the "participating party" influenced the victim to give a clearer description of the perpetrators to the police and that there were inconsistencies in Bar's and Reed-O'Meally's statements.  *Id.* at 2.  Brown did not identify the "participating party," but the Court assumes that he is referring to Reed-O'Meally.[3]  In response, the Commissioner filed a motion to dismiss, arguing that Brown's petition fails to state a claim for habeas corpus relief because he does not raise any claim implicating federal law.  ECF No. 10-8 at 18.  Because the Court agrees with the Commissioner, the Court grants the Commissioner's motion to dismiss.

District courts may entertain a petition for writ of habeas corpus challenging a state court conviction under Section 2254 only if the state petitioner claims that his custody violates the Constitution or federal laws.  *See* 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is in custody in violation of *the Constitution or laws*

---

[3] Brown also states that the police officers then "covered [their] tracks that they did not follow procedure" by asking the victim to identify the perpetrator from an improperly constructed photographic array, ECF No. 18 at 2, but he does not elaborate on this issue and, as noted, makes clear that the "sole ground" for his petition is the newly discovered evidence regarding Reed-O'Meally and the related impeachment material, *id.* at 1.

*or treaties of the United States*." (emphasis added)).  "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions" but rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991).

Brown's habeas claim is based on the newly discovered evidence regarding Reed-O'Meally.  "A claim 'based on newly discovered evidence ha[s] never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) (quoting *Herrera v. Collins,* 506 U.S. 390, 400 (1993)).  Brown, however, does not point to any violation of his federal constitutional rights arising from the newly discovered evidence.  Rather, his argument appears to be that the state trial court misapplied the fourth prong of the Connecticut Supreme Court's *Asherman* standard when it found that the newly discovered evidence would not have resulted in acquittal.  A claim under Section 2254, however, must be based on an issue of federal law regarding the petitioner's conviction, not on a perceived misapplication of state law concerning new trials.  *See Sparman v. Edwards*, 26 F. Supp. 2d 450, 468 n.13 (E.D.N.Y. 1997), *aff'd*, 154 F.3d 51 (2d Cir. 1998) (stating that "in habeas corpus proceedings[,] federal courts do not have jurisdiction to review state court denials of motions for a new trial"); *id.* (concluding that although state court cited "clearly erroneous reasons for denying petitioner's post-trial motion," the court could not find that state court's error constituted a ground for granting habeas corpus relief); *cf. Turner v. Sullivan*, 661 F. Supp. 535, 540 (E.D.N.Y. 1987), *aff'd*, 842 F.2d 1288 (2d Cir. 1988) (petitioner's claim that his right to due process of law was violated by the state court's denial of his motion to vacate judgment without

13

setting forth findings of facts and conclusions of law as required under state law was not

cognizable on federal habeas review because "[a] writ of habeas corpus may not be issued on the

basis of a perceived error of state law"); *Calderon v. Keane*, 2002 WL 1205745, at \*6 (S.D.N.Y.

Feb. 21, 2002) (Report and Recommendation), *adopted by* 2003 WL 22097504 (S.D.N.Y. Sep. 9,

2003), *aff'd*, 115 Fed. App'x. 455 (2d Cir. 2004); ("[F]ederal habeas relief is not available to

redress alleged procedural errors in state post-conviction proceedings. … Claims that focus only

on the state's post-conviction remedy and not on the conviction which is the basis for

[petitioner's] incarceration are not cognizable on habeas review." (internal quotation marks and

citations omitted)).  Thus, because Brown does not point to any federal issues arising from the

newly discovered evidence, he has failed to state a cognizable claim under Section 2254.

Accordingly, the Court dismisses Brown's habeas petition.[4]

---

[4] Brown does not raise his *Brady* claim in this habeas petition but, even if he did, the Court would find that he failed to exhaust his state remedies with respect to the *Brady* claim.

Under Section 2254, a petitioner must exhaust his remedies in state court "[b]efore a federal court may grant habeas relief." *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see* 28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State.").  To satisfy the exhaustion requirement, a petitioner must "fairly present his constitutional claim to the state courts, which he accomplishes by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (internal quotation marks and citation omitted).  A petitioner "does not fairly present a claim to a state court if that court must read beyond a petition or a brief ... that does not alert it to the presence of a federal claim in order to find material ... that does so." *Baldwin v. Reese*, 541 U.S. 27, 32 (2004).  Failure to exhaust may be excused only where "there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981) (per curiam).  A petitioner cannot, however, simply wait until appellate remedies are no longer are available and argue that the claim is exhausted.  *See Galdamez v. Keane*, 394 F.3d 68, 73-74 (2d Cir. 2005), *cert. denied*, 544 U.S. 1025 (2005).

Here, Brown asserted his *Brady* claim in his motion for new trial before the state trial court.  On appeal, however, Brown argued only that the trial court erred in concluding that the newly discovered evidence would not produce a different result at trial, ECF No. 10-2 at 15, and explicitly stated that he did "not challenge the [the trial court's determination regarding the] Brady issue," *id.* at 14 n.4.  After the Connecticut Appellate Court affirmed the trial court's decision, Brown sought discretionary review from the Connecticut Supreme Court, again, only on the issue of whether the newly discovered evidence would likely produce a different result at trial.  ECF No. 10-6 at 2.  Brown did not assert his *Brady* claim in any of his other post-conviction filings.  While Brown asserted his *Brady* claim at the state trial court, he did not raise the *Brady* issue on appeal before the "highest state court capable of reviewing it."  Therefore, Brown has failed to exhaust his state remedies regarding any *Brady* claim.

**III.     CONCLUSION**

For the reasons stated above, the Commissioner's motion to dismiss (ECF No. 10) is GRANTED.  The Court dismisses Brown's Section 2254 petition and directs the Clerk to close this case.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                August 1, 2022